**UNITED STATES of America,**
**Appellee,**

v.

**Clifford Keith MERRILL, Appellant.**

**No. 72–1707.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 12, 1973.

Decided July 20, 1973.

Certiorari Denied Dec. 3, 1973.

See 94 S.Ct. 594.

Donald R. Shultz, Rapid City, S. D., for appellant.

William F. Clayton, U. S. Atty., Sioux Falls, S. D., for appellee.

Before Mr. Justice CLARK,* and HEANEY and BRIGHT, Circuit Judges.

PER CURIAM:

Clifford Keith Merrill, Jr. was found guilty by a jury on three substantive counts of robbery of a federally insured bank and a fourth count of conspiracy to commit such robbery. Merrill challenges his conviction on six points: (1) the Government's alleged failure to establish the District Court's jurisdiction, i. e., that the bank was federally insured; (2) use of a transcript of Merrill's testimony at a previous removal proceeding infringed his privilege against incrimination; (3) the introduction of a spontaneous statement made by the robbery victim at the scene as part of the res gestae; (4) the admission into evidence of a motel registration card bearing Merrill's fingerprint; (5) the denial of Merrill's protective motion that in the event he testified, inquiries as to prior convictions would not be permissible; and (6) the Government's alleged failure to prove beyond a reasonable doubt that the robbery victim's death was caused by the injuries received in the robbery. We find no merit in any of these contentions and, therefore, affirm the judgment.

1. *Proof of F.D.I.C. Coverage:*

█ The federally insured status of the Blackpipe State Bank of Martin, South Dakota, was proved by the certificate of the Federal Deposit Insurance

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation.

Corporation issued to the bank in the regular course of business. This, together with testimony that the insurance premium was paid, was quite sufficient proof that the bank was federally insured under 18 U.S.C. § 2113(f). Scruggs v. United States, 450 F.2d 359 (8 Cir. 1971), cert. denied, Chambers et al. v. United States, 405 U.S. 1071, 92 S.Ct. 1521, 31 L.Ed.2d 804 (1972).

## 2. *Use of Merrill's Testimony at Removal Hearing:*

■ Portions of Merrill's testimony at his removal hearing held in Chicago in which he said that he had never been to Martin, South Dakota, and did not "ever remember going to South or North Dakota" were admitted at his trial. Merrill was represented by counsel at the removal hearing and he does not claim that he was not fully and adequately warned of his rights. In fact he was clearly warned at the hearing that his testimony there might be used against him at any future trial. Merrill cites Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 247 (1968), as authority for excluding his prior testimony. There the Court held that Simmon's testimony at a motion to suppress was not admissible at his trial on the merits. This holding protects a defendant from the necessity of foregoing one constitutional right (privilege against self-incrimination) in order to exercise another one (right to be free from unreasonable search and seizure). In the present case, however, only the privilege against self-incrimination was involved; the exercise of no other constitutional privilege was dependent on Merrill's decision to testify at the removal hearing. Merrill's decision was entirely one of trial strategy. The general evidentiary rule is controlling, i. e., that one's testimony at a prior hearing is admissible in evidence against him at subsequent proceedings. Harrison v. United States, 392 U.S. 219, 222, 88 S. Ct. 2008, 20 L.Ed.2d 1047 (1968). A long line of cases holds that false exculpatory statements are properly admissible as substantive evidence as tending to show guilt. E. g., Rizzo v. United States, 304 F.2d 810, 830 (8 Cir. 1962), cert. denied, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962).

## 3. *Introduction of Spontaneous Statement of O. A. Hodson:*

■ The record indicates that in the early morning of Monday, October 26, 1970 O. A. Hodson, the 88 year old President of the Blackpipe State Bank at Martin, South Dakota, and his son Richard, an officer of the bank, had breakfast at a local hotel in Martin. O. A. Hodson left the cafe before his son and proceeded to the bank.

Merrill and his stepson, Robert J. Bruce, had driven to the bank earlier in a rented car and had parked near the rear entrance of the bank. Merrill and Bruce had not expected Hodson to appear so early. When the latter had reached the entry way of the bank, Merrill, armed with a pistol, and his stepson ran up to Hodson and demanded that he open the bank door. When he refused, Merrill hit him on the head with the pistol and Hodson began to bleed profusely, whereupon Merrill took the bank keys from him, opened the door and dragged Hodson into the posting room behind the tellers' section. He then tied Hodson's hands behind his back and taped his feet and his mouth. When Hodson refused to give the combination of the safe to Merrill, the latter searched through the teller's cage and drawers and took the bait money. Merrill again demanded the combination and when Hodson refused, kicked him on the buttocks, ribs, belly and back near the left hip. Hodson's wallet was taken from him and his body was thrown in the corner against a wastepaper basket.

Merrill removed approximately $100 from the wallet and then threw it in the wastebasket. Hodson's eyeglasses were also found in the wastebasket. Bruce and Merrill were in the bank about half an hour when Bruce became alarmed and fled the bank at the sight of Richard Hodson outside the bank. The fa-

ther signalled to Richard and he, along with his brother Bruce Hodson, also a bank officer, came running up. When the tape was removed from the elder Hodson's mouth and his hands were untied, he told his son Bruce:

> "He could not believe that somebody would tie and gag another human being and then stomp him. He said, 'Son, I didn't think anybody would do that to a dog.'"

This conversation was admitted into evidence as res gestae. The record shows that the elder Hodson was nervous, apprehensive and in a state of emotional shock. He was bleeding actively from headwounds. The statements were made under the stress and strain of the moment. Because of these circumstances and the close proximity of the utterances to the event, the trial judge determined that Hodson's statement was admissible. Such a determination rests with the sound discretion of the trial court, to be disturbed only when clearly erroneous. Roberts v. United States, 332 F.2d 892, 898 (8 Cir. 1964), cert. denied, 380 U.S. 980, 85 S.Ct. 1344, 14 L. Ed.2d 274 (1965). A careful study of the record supports the District Court's determination.

4. *Admission of Motel Registration into Evidence:*

█ There is no merit to the contention that Merrill's registration card with the Hot Springs, South Dakota, motel, where he and Bruce spent the night the day before the robbery, was improperly admitted into evidence. It was identified by the motel's manager, who had personally prepared it when Merrill registered and who testified that such registration cards were kept in the ordinary course of business. A motel clerk testified that at the request of the F.B.I. she had searched the motel's business records for the card. The cards were indexed alphabetically and Merrill's card was found in its proper place. The card was examined by experts at the F.B.I., who were able to develop Merrill's latent fingerprint. This proof met the test of 28 U.S.C. § 1732. *See* United States v. Anderson, 447 F.2d 833, 838 (8 Cir. 1971), cert. denied, 405 U.S. 918, 92 S. Ct. 943, 30 L.Ed.2d 788 (1972). In addition, Bruce testified for the Government that he and Merrill spent the night at the motel as shown on the registration card.

5. *Merrill's Protective Motion Concerning the Use of Former Convictions:*

██ Merrill moved for a protective order prohibiting the Government from cross-examining him on his felony record in the event he took the stand. He claims that because the motion was denied, he was barred as a practical matter from taking the stand in his own defense. It is hornbook law that one who takes the stand in his own defense may be cross-examined relative to prior convictions. United States v. Scarpellino, 431 F.2d 475, 478–479 (8 Cir. 1970).

6. *Proof as to the Cause of Death of O. A. Hodson:*

█ Merrill claims that the Government failed to prove beyond a reasonable doubt that O. A. Hodson's death resulted from injuries which he received in the bank robbery. We have carefully reviewed the record on this point and cannot agree.

Hodson was 88 years of age at the time of the robbery. Prior to the robbery he was in "excellent health," according to his physician, Dr. Gerald Walton. Dr. Walton was a 38 year old graduate of the Southwestern Medical School at Dallas and had been in the practice at Martin, South Dakota, since 1965. He had been O. A. Hodson's doctor since coming to Martin and had seen him frequently around town and a few times professionally. During this period Hodson was never hospitalized and suffered no serious illnesses. A routine physical examination made by Dr. Walton on January 8, 1970, indicated that Hodson's cardiogram was "within normal limits" and his health "excellent."

On the morning of the robbery Dr. Walton received an emergency call to

come to the bank and he arrived there shortly after 8:00 a. m. He found Hodson "lying on the floor . . . somewhat in a state of emotional shock and very nervous and apprehensive. He was bleeding actively from a head wound." Dr. Walton had him removed by ambulance to the hospital. Examination showed no evidence of any skull fracture or bleeding under the skin. His blood pressure was 132 over 58, somewhat lower than at previous examinations but "not significantly low." His respiration and temperature were normal, but his pulse showed "some irregularity." Tests indicated pus cells in his urine which were related more to trauma than to infection. He had developed a cardiac irregularity with "some weakness and dizziness for several days and ran a persistent elevated blood count, white blood cells . . ." He was placed on antibiotics ". . . because of his age and the wounds that he had received on the head." He was discharged from the hospital on October 30 "to home rest." At the time he was "somewhat weak, still having some cardiac irregularity but his wounds seemed to be healing well at that time." There was some swelling in the left hip area along with some bruises in the buttocks and hip. Dr. Walton found the heart irregularity to be the result of stress associated with the robbery assault. An examination on November 12 at Dr. Walton's office revealed an anemic condition with elevated white cell count. Diarrhea had also developed and Mr. Hodson experienced slight confusion and vertigo for several days. Mr. Hodson was returned to the hospital on November 19, 1970, with acute diarrhea and acute urinary retention. He was catheterized and 2000 c.c.'s of urine were removed from the bladder. An earlier urinalysis on October 27 "indicated there was evidence of injury or trauma to the urinary tract." Hodson began to spike fever on the day of admission to the hospital. The doctor attributed this condition to the urinary tract obstruction and infection in turn related to difficulty in urination and treatment for the diarrhea and to the "possible injury." During hospitalization Hodson developed fluid in the lungs because his heart was not sufficiently pumping the blood fluid through his system. A tracheostomy was performed on November 25 to facilitate suctioning of the lungs and assist breathing. On November 28 Mr. Hodson suffered a cardiac arrest and died. Dr. Walton found that the causes of death "were related to his initial injuries [suffered at the bank robbery] and complications that developed thereafter.[1] An autopsy of Mr. Hodson by Dr. Freeman revealed "large black and blue areas over the dorsal surface of the hands," indicative of intravenous infusion; lacerations on the top of the head which were healed; heavier lungs than usual with probable areas of pneumonia; a blood clot in the main artery of the heart: "a normal size heart and remarkably good for a man of his age"; liver within normal weight range; kidneys were normal; bladder was discolored or red; a scar was found in the cerebellum of four weeks or more duration. Dr. Freeman concluded that the cause of death was "hospitalization leading to—with bed rest—leading to bronchial pneumonia and pulmonary embolus."

The cause of death issue was properly submitted to the jury and it found against Merrill. Viewing the evidence, as we must, in the light most favorable to the prosecution, we believe that the

1. Merrill asserts that Dr. Walton could not relate the infection, urinary retention or diarrhea to the blows received at the bank robbery. In his direct testimony Dr. Walton did say that "it would be impossible to say specifically that the infection came about as a result of the blows." However, on cross-examination he was shown the October 27 urinalysis which he said: "I hadn't seen for some time" and this did indicate injury or trauma to the urinary tract. This in turn brought on difficulty in urination and infection. Merrill also claims that there was no evidence of bed rest. The record, however, shows continuous bed rest during two periods of hospitalization together with "home rest."

Government clearly sustained its burden of proof. Evidence of a chain of causation leading from injuries suffered in the robbery assault to Hodson's death was strong and there were no missing links in that chain.

In the light of all of these considerations the judgment is affirmed.