UNITED STATES of America, Appellee,

v.

Charles Lewis WILLIAMS, Appellant.

UNITED STATES of America, Appellee,

v.

Johnny Clayborn PARKER, Appellant.

UNITED STATES of America, Appellee,

v.

Allen Ray JOHNSON, Appellant.

Nos. 76–2332–76–2334.

United States Court of Appeals,
Fourth Circuit.

Argued March 16, 1977.

Decided July 20, 1977.

---

Charles B. Winberry, Rocky Mount, N. C. (Biggs, Meadows, Batts, Etheridge & Winberry, Rocky Mount, N. C., W. Kenneth Hinton, Daughtery & Hinton, Smithfield, N. C., D. K. Stewart, Stewart & Hayes, Dunn, N. C., L. Austin Stevens, Smithfield, N. C., on brief), for appellants.

Jack B. Crawley, Jr., First Asst. U. S. Atty., Raleigh, N. C. (Carl L. Tilghman, U. S. Atty., Raleigh, N. C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge, and WINTER, Circuit Judge.

WINTER, Circuit Judge:

Charles Williams, Johnny Parker and Allen Johnson were convicted of the theft of Amoco super premium gasoline from a pipeline terminal and storage facility at Selma, North Carolina, in violation of 18 U.S.C. §§ 659 and 2. From their convictions, they appeal. All three contend that the gasoline, when allegedly stolen, no longer constituted an interstate shipment and that therefore their convictions must be set aside. Parker also contends that there was insufficient evidence to convict him. Finding these and other subsidiary contentions without merit, we affirm.

## I.

Colonial Pipeline Company (Colonial) operates an interstate pipeline originating in Texas, traversing the southeastern United States and terminating in New Jersey. The pipeline is used to transport Amoco super premium gasoline, produced by American Oil Company (Amoco) in Texas, and gasoline of other producers from places of production to points of distribution. In Greensboro, North Carolina, there is a spur off of the main pipeline. The spur has its terminus in Selma, North Carolina, at a storage facility owned jointly by Cities Service Company (Cities Service) and Amoco, which is operated by Cities Service.

Amoco super premium gasoline is transported from Texas to the Selma terminal under very high pressure. It is delivered to a storage tank in the terminal, and from there it is pumped through a series of lines to a meter and then to transport trucks. Gasoline is never delivered directly from the pipeline to a transport truck; it must pass into the storage tank before being pumped into delivery trucks in order to reduce the very high pressure previously needed to move it through the main pipeline. Once gasoline passes into the storage tank, it cannot reenter the spur or the main pipeline. Ordinarily, gasoline remains in the terminal no more than four days before delivery to a transport truck is made. In the instant case, the gasoline allegedly stolen was in the storage tank for only twenty-four hours.

Delivery of gasoline to transport trucks is accomplished by a mechanized computer system involving the use of a set of coded cards. Approximately 200 of these sets are outstanding and in the hands of customers or transport operators. When a truck is brought to a delivery pipe and the cards inserted in the proper slots, the system pumps gasoline into the truck and charges the customer's account for the amount delivered.

On the morning of November 12, 1975, the manager of the Selma facility found that his office had been broken into during the preceding night and three cards referred to as "house cards," used to load gasoline from the terminal to transport trucks, were missing. An investigation revealed that through use of the stolen loading cards, approximately 26,000 gallons of Amoco super premium gasoline had been pumped from the terminal with no supporting documentation, and that the gasoline had been pumped during the night of November 11 and the morning of November 12 in three separate lots of approximately 8,725 gallons each. Ultimately, Williams, Parker and Johnson were charged with the theft.

At their trial, Larry Williams, an indicted coconspirator whose case was continued and later dismissed, testified that he was employed as the driver of a bulk gasoline tank

truck by defendant Williams who was president of Williams Oil Company (the "Company") located in Fayetteville, North Carolina. On the night of November 11, 1975, according to Larry Williams, defendant Williams instructed him to drive the truck to Dunn, North Carolina, because the Company had a "chance to get some cheap gas." Johnson came upon the scene and said there would be no trouble getting the gasoline because "the boy had cards to load the pumps."

Three times during the night of November 11 and the early morning hours of November 12, Larry Williams drove an empty tanker to Johnson's office in Dunn, North Carolina, where the truck would be left and would be driven away by someone else. About an hour later, the truck would be returned, fully loaded, and Larry Williams would drive it to Fayetteville. On the first two returns, the truck's contents were unloaded at the Company's bulk plant, while on the third trip the contents were delivered to various filling stations in the area. The capacity of the truck driven by Larry Williams approximated the quantity of each of the three thefts of gasoline.

Larry Williams could not identify the driver who would drive the empty tanker away from Dunn and return it loaded, but he described him as approximately twenty-seven years old, about six feet tall, and weighing from 160 to 170 pounds. Larry Williams testified that Johnson said the other driver got twenty-five cents per gallon for obtaining the gasoline. Parker matched Larry Williams' description. In addition, Parker was familiar with the complex card-loading procedure at the Selma terminal, and Parker was shown to have claimed to have over $5,000 in cash in a tackle box in his automobile although he earned only $160 per week.

In charging it, the district court told the jury that an element of the crime was that the goods taken "were moving as or constituted a part of an interstate shipment at the time of the taking." The court stressed that the interstate character of the property stolen was an essential element of the offense. The jury was told that the interstate character of the shipment "commences when the property is segregated for interstate shipment and comes into the possession of those who are assisting its course in interstate transportation and continues until the property arrives at its destination and is there delivered." Further, the jury was told that, under 18 U.S.C. § 659, the removal of property from a pipeline system which extends interstate is prima facie evidence of the interstate character of the shipment of the property and that this presumption was sufficient for the jury to find the interstate character of the shipment in the absence of evidence which leads the jury to a contrary conclusion.

## II.

We think both that the district court correctly stated the law with respect to the interstate element of the crime charged and that in this case there was an ample evidentiary basis on which the jury could conclude that the stolen gasoline was a part of interstate commerce when it was taken.

The statute, 18 U.S.C. § 659, under which defendants were convicted, makes it a crime to obtain unlawfully from any pipeline system, tank or storage facility, any goods "moving as or which are a part of or which constitute an interstate or foreign shipment."[1]  *United States v. Asto-*

---

1. In pertinent part, 18 U.S.C. § 659 provides:
   Whoever embezzles, steals, or unlawfully takes, carries away or conceals, or by fraud or deception obtains from any pipeline system, railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or

chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property; ·

   Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100, he shall be fined not more

*las,* 487 F.2d 275, 279 (2 Cir. 1973), *cert. denied,* 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974). In order to constitute an offense under the statute, it is not necessary that the goods be actually moving in interstate commerce at the time of theft. *United States v. Astolas, supra;* *United States v. Gollin,* 176 F.2d 889 (3 Cir.), *cert. denied,* 338 U.S. 848, 70 S.Ct. 89, 94 L.Ed. 519 (1949). It is sufficient if they are a part of an interstate shipment. Moreover, § 659 makes removal of gasoline from an interstate pipeline system prima facie evidence of the interstate character of the shipment. Ordinarily, the question of whether goods are moving in interstate commerce or constitute part of an interstate shipment is a practical one. *United States v. Gates,* 528 F.2d 1045, 1047 (5 Cir.) (per curiam), *cert. denied,* 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (October 4, 1976); *United States v. Astolas,* 487 F.2d 275, 279 (2 Cir. 1973), *cert. denied,* 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974); *United States v. Cousins,* 427 F.2d 382, 385 (9 Cir. 1970); *United States v. Maddox,* 394 F.2d 297, 299 (4 Cir. 1968).

There can be little doubt that the § 659 presumption is applicable to this case. Section 659 was amended in 1966 to expand its coverage to pipeline systems, tanks and storage facilities. The 1966 amendment was designed to extend the protections accorded by federal law to other carriers to the pipeline industry, and was passed in response to what was perceived to be increased dangers to pipeline systems stemming from increased automation, the inaccessibility of sections of pipeline, and the inability of local authorities to provide deterrence and the supervision adequately to protect such a system. S.Rep.No. 1555, 89th Cong., 2d Sess., 1–2 (1966). Because there was no opposition to the amendment, the legislative reports say little more than this, but the final enactment contains different language from the amendment as introduced, and these changes are significant.

As introduced, the amendment would have inserted only the words "pipeline" and "tank" in the then existing § 659. The Department of Justice, however, suggested these terms were too narrow and recommended the use of "pipeline system" and "storage tank." At hearings before the Senate Committee on Commerce, industry spokesmen agreed with these changes and further suggested that the language "tank or storage facility" be added. Both suggestions were adopted in the final enactment.

Three points raised at the hearings are pertinent: First, the language "pipeline system" was understood to cover gathering lines from natural gas wells to natural gas extraction plants, where liquids are extracted and from where the gas is sold to interstate pipeline companies. Proposed amendments to 18 U.S.C. § 659: Hearings Before the Committee on Commerce, 89th Congress, 2d Sess. 21, 27–28 (1966) (exchange between Senator Monroney, the Bill's sponsor, and Mr. Durand). Second, the term "storage facility" was proposed and accepted to include working tanks, bulges in the line which are used to reduce pressure and where products are accumulated before they go into the line. *Id.* at 27. Third, the proposed legislation was designed to cover underground shale storage facilities, including those at distribution points, where natural gas is stored to handle seasonal peaks. *Id.* at 28. Simply put, the language inserted in new § 659 was designed to protect those facilities integral to the system. *Id.* at 28; H.R.Rep.No. 2144, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Admin. News p. 3271.

■ Considering the broad purposes of the amendment to § 659, we think there is sufficient evidence to sustain the verdict on two grounds: first, the jury could have found the storage terminal was part of the pipeline system and, then, utilized the stat-

---

than $1,000 or imprisoned not more than one year, or both.

. . . . .

The removal of property from a pipeline system which extends interstate shall be prima facie evidence of the interstate character of the shipment of the property.

utory inference; second, the jury could have found that the gasoline constituted an interstate shipment at the time of theft regardless of the inference.

Gasoline travelling through the spur from Greensboro to Selma belonged to at least six different oil companies. When it arrives at Selma, it could not be left in the pipeline because it would interfere with shipments made by other producers. Because the highly pressurized gasoline could not be pumped directly into delivery trucks, there had to be a "storage facility" in Selma, where all of the gasoline of a given kind was collected and its pressure reduced so that it could be transported further for ultimate use. This storage facility was, therefore, just as much part of the pipeline system as a gathering line and was just as necessary to the system as a working tank or an underground storage facility.

The fact the gasoline was seldom in the storage terminal for more than four days reinforces the conclusion that the facility was inexorably linked to the pipeline system and was not designed to serve any independent function. Merely because the storage facility was owned by Cities Service and Amoco, and not Colonial, is not determinative. *United States v. Astolas*, 487 F.2d 275, 280 (2 Cir. 1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305 (1974); *Winer v. United States*, 228 F.2d 944, 947 (6 Cir.), *cert. denied*, 351 U.S. 906, 76 S.Ct. 695, 100 L.Ed. 1442 (1956); *United States v. Gollin*, 176 F.2d 889, 893 (3 Cir.), *cert. denied*, 338 U.S. 848, 70 S.Ct. 89, 94 L.Ed. 519 (1949).

Therefore, the storage facility could be found to be part of the pipeline system. *Cf. United States v. Douver*, 472 F.2d 472, 476 (9 Cir.), *cert. denied*, 411 U.S. 954, 93 S.Ct. 1933, 36 L.Ed.2d 416 (1973) (parked trailer at platform is part of warehouse not a "motor truck or other vehicle"). This finding and the inference permitted by § 659 would alone carry the case to the jury and be sufficient to support its verdict.[2]

The other facts in this case not only supported the inference permitted by the statute but permitted the jury to find that the shipment had an interstate character at the time of theft. In determining whether a shipment's interstate character has terminated, an appropriate test is whether there has been actual receipt by the party whose proprietary interest in the goods is purely localized. Stated otherwise, "[a]n interstate or foreign shipment does not lose its characteristic until it arrives at its final destination and is there delivered." *United States v. Yoppolo*, 435 F.2d 625, 626 (6 Cir. 1970); *United States v. Jones*, 446 F.2d 48, 49 (4 Cir. 1971). When the gasoline in the instant case was sent from Texas, it was destined for Selma, North Carolina, where Amoco had continuing contractual relationships with various purchasers for the gasoline's purchase. Amoco did not have it transported to Selma for Amoco's use; it was transported for resale to various distributors. While the gasoline entered a storage facility for a short period of time prior to its delivery to local distributors, it had been in the terminal only twenty-four hours when stolen and the stopover was necessary to effect delivery to those for whom it was destined. We think that it makes no difference that there was no proof of specific purchasers of the gasoline shipped to North Carolina, because there was proof of a general group or pool of purchasers. *Cf. United States v. Maddox*, 394 F.2d 297, 299 (4 Cir. 1968). In our view, it follows that the jury could well find that the gasoline was still in the process of being shipped from Texas to North Carolina to its ultimate purchasers.[3]

---

2. On the facts of this case, we see no constitutional infirmity in the use of the statutory inference. *Barnes v. United States*, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); *United States v. Gainey*, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965).

3. *United States v. Padilla*, 457 F.2d 1403 (9 Cir. 1972), directly supports our conclusion. In that case, two vessels bringing shipments destined for various J. C. Penney stores docked in California. After the goods were taken from the ships, they were counted and put in a transit shed. From there the goods were taken to a warehouse in the port facility set aside for

### III.

The only other issue which merits discussion is Parker's contention that there was insufficient evidence legally to convict him. We are not persuaded by it.

We have recited Larry Williams' general description of the individual who three times drove away the empty tanker and returned it loaded. Though Williams was not able to identify Parker as the man, the jury obviously could compare the description with Parker's physical appearance and draw its own conclusion. Williams also testified that a large sum of money had been promised to the third participant in the theft and Parker claimed that he had a large sum of cash immediately following the theft. His explanation of where the cash came from could well have been found incredible. *United States v. Rouse,* 494 F.2d 45, 46 (5 Cir. 1974) (per curiam); *United States v. Corso,* 439 F.2d 956, 958 (4 Cir. 1971) (per curiam).

■ In addition, Parker, who had worked for a company purchasing gasoline from the terminal, was one of only 200 persons who had the expertise to operate the tank facility. Finally, Parker denied knowing Charles Williams and Johnson when he was arrested, but there was credible evidence that he communicated extensively with them and therefore he gave a false exculpatory statement, itself evidence of guilt. *United States v. Merrill,* 484 F.2d 168, 170 (8 Cir.), *cert. denied,* 414 U.S. 1077, 94 S.Ct. 594, 38 L.Ed.2d 484 (1973); *United States v. Kilpatrick,* 458 F.2d 864, 867 (7 Cir. 1972). Even though the evidence connecting Parker to the crime was circumstantial, we think it sufficient to support Parker's conviction. *United States v. Taylor,* 482 F.2d 1376, 1376–77 (4 Cir. 1973) (per curiam); *United States v. Sherman,* 421 F.2d 198, 199–200 (4 Cir.), *cert. denied,* 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

Penney, where they were again counted. The court found that goods stolen from the Penney warehouse were still a part of foreign commerce even if they had been stored at the

### IV.

■ We have considered the other contentions and find them without merit. The credibility of Larry Williams was an issue for the jury so long as the government's favorable treatment of him was fully disclosed. *United States v. Clark,* 541 F.2d 1016, 1018 (4 Cir. 1976) (per curiam); *United States v. Maddox,* 394 F.2d 297, 299 (4 Cir. 1968). If there was any error in not striking the testimony of another government witness, it was harmless beyond a reasonable doubt.

*AFFIRMED.*

ALBERT V. BRYAN, Senior Circuit Judge, dissenting:

In my view the evidence was inadequate to support Federal jurisdiction and, hence, the case should have been dismissed rather than submitted to the jury. My concern is that this court's opinion allows a forbidden incursion into the domain of State law and for this reason do I not join in it.

In usurping jurisdiction of the indicted larceny, the Federal courts here are trespassing where Congress explicitly admonished that they should tread with caution. The very statute creating the crime in prosecution states: "Nothing contained in this section shall be construed as indicating an intent on the part of Congress to occupy the field in which provisions of this section operate to the exclusion of State laws on the same subject matter  .   .   . ."

North Carolina, of course, punishes theft of gasoline within the State; the crime here was no more than that. Instead the court extends the offense into Federal condemnation. To do so casts the gasoline as still moving in, or constituting a part of, an interstate shipment when it was stolen.

I pursue the path posted by the majority to determine the category of the gasoline:

orders of Penney and Penney could have taken delivery. Likewise, here, the gasoline, when in the storage terminal or facility, was still within the ambit of interstate commerce.

"Ordinarily, the question of whether goods are moving in interstate commerce or constitute part of an interstate shipment is a practical one".

To start, after the gasoline entered the storage tank, it was sealed off from the interstate system; it could not return to the spur or the main line. Its severance from the system was marked and recorded by the system computer. Amoco came again into possession of the gasoline it had possessed in Texas.

Next, while in the present circumstances the gasoline only remained in the storage tank for 24 hours, that does not fix its status. Its position is determined by how long it *may* reside in isolation. Generally, we are told, the stay is no more than four days, but there is nothing to indicate it could not be longer. The point of this factor is its proof that the shipment was treated by Amoco as having come to rest after it entered the tank. It had "arrived at its final destination and [was] there delivered". *Cf. United States v. Yoppolo*, 435 F.2d 625, 626 (6 Cir. 1970).

Still again, it was to be sold in regular course of trade from the tank to such cardholders as had access to it if, as and when they desired it. It was as if they had keys to the warehouse. The Government has not established that the gasoline had been preordered or pre-sold to them. So far as the proof discloses they could buy or not as they saw fit. The gasoline *could* stay in the tank indefinitely. Surely it loses its interstate image in the tank at some time. That must have been when it entered the tank, for there is no later determinant. We are not shown that the sales were anything more than across-the-counter sales of merchandise.

This court in *United States v. Maddox*, 394 F.2d 297, 299 (4 Cir. 1968), outlined how the character of the gasoline should be adjudged, saying:

"The deposit of cargo in a warehouse *may under certain circumstances consti-*tute a coming to rest, marking the termination of an interstate or foreign shipment. At other times, however, the stop-off at the warehouse may be only a pause in the course of an uncompleted journey. Standing alone, the removal of goods to a warehouse is not conclusive; nor is the consignee's power to divert the goods from the intended interstate commerce. * * * These are merely factors to be considered, but there is no rigid rule of law that mandates a holding either way. The answer in any particular case must depend on a factual assessment." (Accent added.)

Thus in the circumstances here the uncontroverted indicia of the gasoline's posture reveal that the gasoline was in repose *intra* the State when stolen.

But the court would supply the deficiency by reliance upon the presumption in the statute, 18 U.S.C. § 659:

"The removal of property from a *pipeline system* which extends interstate shall be prima facie evidence of the interstate character of the shipment of the property." (Accent added.)

However, by its very terms this presumption does not apply presently because the unlawful taking was not from "a pipeline system" but rather from a storage tank, a studied difference. The latter is in the proscriptive provisions distinguished from the "pipeline system" of the presumption. Thus this statute, with emphasis noted, provides:

"Whoever embezzles, steals or unlawfully takes, carries away or conceals, or by fraud or deception obtains from any *pipeline system* . . . *or* from any *tank or storage facility* . . . any goods or chattels moving as or which are part of or which constitute an interstate or foreign shipment of freight, express or other property shall in each case [be punished]."

Each of the three counts in the present indictment makes the distinction, charging

that the pilferage was from penalize stealage from an interstate movement or interstate storage, but the *presumption* would not apply to any taking save one from a pipeline system.

The 1966 amendments, as discussed by the majority, sharply make the differentiation. They did not even purport to enlarge the presumption; they simply expanded the types of container embraced in the enactments. In this addition Congress was careful to enumerate each of them separately, manifesting that the legislators were preserving their several identities. With these identifications in mind, "pipeline system" was included for the first time and the presumption was confined to a pipeline system. Obviously, it was not intended to apply elsewhere.

The reason for this inclusion is obvious: a pipeline system runs for thousands of miles and Congress needed to cover every foot of it. It wished to protect transportation by pipeline, a somewhat recent utility. Interestingly, the presumption provision was written by the Department of Justice and engrossed ipsissimis verbis within the law.

The Federal Government has no reason for being here.