914 F.2d 1468
 Robert Copeland BISHOP, Petitioner-Appellant,
v.
Ira D. KELSO, Superintendent of the Lee Correctional
Institution and Michael J. Bowers, Attorney
General of the State of Georgia,
Respondents-Appellees.
 No. 89-8641.
 United States Court of Appeals,
Eleventh Circuit.
 Oct. 15, 1990.
 
 George M. Weaver, J. Melvin England, England Weaver & Kytle, Atlanta, Ga., for petitioner-appellant.
 Michael J. Bowers, Atty. Gen., Susan V. Boleyn, Dennis R. Dunn, Asst. Attys. Gen., Atlanta, Ga., for respondents-appellees.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before HATCHETT, Circuit Judge, HILL* and FAIRCHILD**, Senior Circuit Judges.
 FAIRCHILD, Senior Circuit Judge:
 
 
 1
 Robert Copeland Bishop is serving a mandatory life sentence in Georgia after being convicted of malice murder. After exhausting his state remedies, he filed a petition for habeas corpus in federal court. He appeals the district court's dismissal of that petition. His appeal raises the question whether the state introduced enough evidence to prove that his actions were the proximate cause of the death of the victim.
 
 I.
 
 2
 Mr. Bishop thought someone had been breaking into his trailer home, so he rigged a gun inside the trailer, set to fire when the front door was opened. A friend of his, James Ronnie Freeman, came to the trailer when Mr. Bishop was gone, opened the front door, and got shot by the trap gun. The bullet glanced off his right thigh and entered his forearm. Mr. Freeman's thigh wound was superficial, but his forearm wound was more serious, fracturing and exposing the bone.
 
 
 3
 Mr. Freeman was taken from the trailer home to Humana Hospital. Upon admission, a doctor treated Mr. Freeman's wound, operated on his forearm, and stabilized his condition. He was transferred a few days later to Crawford Long Hospital for reconstructive surgery to his forearm. There, a 19 X 15 centimeter skin graft was taken from his left lateral thigh, up near the hip area. Tr. 129. A bone graft was taken from the left lateral iliac area, higher up than the skin graft. Tr. 129. He also apparently had a surface nerve graft. Tr. 120. The treating physician at Crawford Long was happy with Mr. Freeman's progress, and after about two weeks in the hospital, he was released and went home. Late that evening or early the next morning, he developed trouble breathing and died.
 
 II.
 
 4
 Due process requires a state to prove each element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560 (1979). On federal habeas corpus review of a state conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319, 99 S.Ct. at 2789 (emphasis in original). The government's proof need not rule out every theory except guilt beyond a reasonable doubt. Id. at 326, 99 S.Ct. at 2793 (emphasis added).
 
 
 5
 The element at issue here is causation--whether the shot fired by Mr. Bishop's gun was the actual, and proximate, cause of Mr. Freeman's death. There is no dispute that Mr. Bishop is criminally responsible for the injuries caused by the trap gun he set. Nor is there any dispute that the immediate cause of Mr. Freeman's death was a pulmonary embolism--a blood clot which blocked the blood flow between his heart and lungs. However, Mr. Bishop questions whether the prosecution introduced enough evidence to prove that the gunshot wounds caused the pulmonary embolism, rather than something unrelated to the wounds. And, he argues that the evidence which did tend to prove that the gunshot wounds precipitated the embolism was "tentative," and pointed only to cause in fact, not proximate cause, and thus was insufficient to support a conclusion beyond a reasonable doubt that the gunshot wounds were the proximate cause of death.
 
 
 6
 We have no trouble concluding that if the pulmonary embolism resulted from the gunshot wounds or the necessary treatment and bedrest, the requirement of proximate cause was met. Under Georgia law, which defines the elements of the offense, when a person "inflicts an unlawful injury, such injury is to be accounted as the efficient, proximate cause of the death, whenever it shall be made to appear ... that [ ] the injury directly and materially contributed to the happening of a subsequent accruing immediate cause of the death...." Ward v. State, 238 Ga. 367, 369, 233 S.E.2d 175 (1977) (quoting Wilson v. State, 190 Ga. 824, 829, 10 S.E.2d 861 (1940)). Specifically, if death results from a pulmonary embolism which was caused by injuries for which the defendant is criminally responsible, proximate cause is satisfied. Larkin v. State, 247 Ga. 586, 278 S.E.2d 365, 365-66 (1981); Rachel v. State, 247 Ga. 130, 274 S.E.2d 475, 476-77 (1981). See also People v. Gacho, 122 Ill.2d 221, 119 Ill.Dec. 287, 522 N.E.2d 1146, cert. denied, 488 U.S. 910, 109 S.Ct. 264, 102 L.Ed.2d 252 (1988); Pittman v. State, 528 N.E.2d 67, 70 (Ind.1988); United States v. Merrill, 484 F.2d 168 (8th Cir.), cert. denied, 414 U.S. 1077, 94 S.Ct. 594, 38 L.Ed.2d 484 (1973); State v. Tjaden, 69 N.W.2d 272, 279 (N.D.1955); People v. Gittings, 136 Ill.App.3d 655, 91 Ill.Dec. 207, 483 N.E.2d 553, 559 (1st Dist.1985); Commonwealth v. Drew, 11 Mass.App. 517, 417 N.E.2d 53, 57 (1981).
 
 
 7
 The harder question concerns actual cause--whether the evidence was sufficient to support a conclusion that, beyond a reasonable doubt, Mr. Freeman's embolism actually resulted from the gunshot wounds or subsequent treatment, rather than from some unrelated cause.
 
 
 8
 In cases such as this, determining the actual cause of death is a matter for expert testimony. Williams v. Martin, 618 F.2d 1021, 1026 (4th Cir.1980). Two medical experts testified: Jack Powell, the doctor who treated Mr. Freeman upon his admission to Humana Hospital, and Fred Gilbert, the forensic pathologist who performed the autopsy.
 
 
 9
 Dr. Powell characterized Mr. Freeman's thigh wound as superficial and his forearm wound as serious, but not life-threatening. Tr. 115, 113-14. He had not participated in the autopsy on Mr. Freeman, and expressed no opinion on what precipitated the pulmonary embolism. Tr. 122. He did testify that "it ought to be in the path of the bullet," and that pulmonary embolisms usually originate in the "lower extremities" (legs), and that ones which result in death usually originate in the thigh. Tr. 117-18. As to what causes embolisms, he said that "It can be caused by bedrest. You can get it from making a trip or sitting still. Anywhere. You can get it from anything," including sitting at a desk. Tr. 119.
 
 
 10
 The pathologist, Dr. Gilbert, was more specific about the causes of embolisms. He testified they can result from an injury to the "lower extremities," and, less often, from injuries to the "upper extremities" (arms). Tr. 124-25, 127. He explained that
 
 
 11
 Normally what occurs is that you have a patient that is hospitalized, or a person that has had an injury to the lower extremity and a blood clot develops in the leg or in the pelvis area and these blood clots break loose and go through the veins in the body up to the heart and then get thrown out to that vessel that leads to the lungs. Occasionally in older persons that have some arrhythmia a clot will form actually inside the heart and these clots will be dislodged, will locate in the big vessel and block it and cause death.
 
 
 12
 Tr. 124-25. Pulmonary embolisms are not commonly seen in persons Mr. Freeman's age, thirty-six years, Dr. Gilbert agreed. Tr. 125.
 
 
 13
 Dr. Gilbert concluded that the pulmonary embolism which struck Mr. Freeman originated in his lower left extremity, which was also the site of the source tissue for the skin and bone grafts. Tr. 126, 128, 129-30. He did not state definitely that the gunshot wound or resulting treatment caused the embolism, but he agreed that the wound, and the subsequent surgery and hospitalization "could have" brought about the embolism, and that it was "possible" there was a connection. He agreed that it is "fair to say that but for a gunshot wound requiring surgery it's not likely that this clot would have occurred." Tr. 126.
 
 
 14
 Mr. Bishop argues that this just isn't enough evidence to permit a rational juror to conclude beyond a reasonable doubt the embolism was causally related to the injuries inflicted by his gun. This raises a serious question whether, in a case where expert testimony is necessary to determine a factual question, testimony that the gunshot wounds and resulting surgery were a "possible" cause, and that any other cause was "not likely," can support a conclusion, beyond a reasonable doubt, that they were the cause.
 
 
 15
 Dr. Powell's testimony showed that it is at least possible that Mr. Freeman's pulmonary embolism and death resulted from a cause independent of the gunshot wounds. Certainly the prosecution could have presented more thorough evidence concerning the cause of the pulmonary embolism, perhaps by asking the two doctors to estimate the degree of probability that the embolism resulted from the gunshot wounds and resulting treatment, or by asking Dr. Gilbert for his opinion on causation to a reasonable degree of medical certainty, rather than supplying him with the proposition that other causes were "not likely" and leaving it at that. Nonetheless, we feel the prosecution met, barely, the minimum showing necessary under Jackson to sustain the conviction.
 
 
 16
 Dr. Gilbert testified that it was not likely that the embolism was precipitated by independent causes, and he concluded that the clot itself originated in the same region of Mr. Freeman's leg from which the various grafts were taken. He did not explain how he reached this conclusion (the clot being found in the pulmonary arteries during the autopsy), and he did not specifically say that bone graft surgery could cause an embolus. However, Dr. Powell did testify that an embolism could result from surgery or a deep injury, and presumably retrieving tissue for a bone graft would qualify. This testimony tended to show an increased probability that the embolism resulted from the treatment necessitated by the forearm wound.
 
 
 17
 Furthermore, even though Dr. Powell testified that a pulmonary embolism can be caused by just about anything, the jury was entitled to draw on the medical testimony that pulmonary embolisms are not commonly seen in thirty-six year old men, as well as the common knowledge that men of that age do not often drop dead for no externally apparent reason. The record contains nothing to show that Mr. Freeman was at any greater risk of a pulmonary embolism than any other person his age, except that he had been shot, underwent reconstructive surgery, and spent two weeks in the hospital, all due to Mr. Bishop's gun. Without some evidence in the record of an independent cause which could have triggered an embolism, the mere speculative possibility that the embolism was not related to the gunshot wounds does not prevent a rational juror from concluding beyond a reasonable doubt that it was related.
 
 
 18
 The lack of record support of an independent cause for the embolism, along with stronger positive testimony tying the embolism to the gunshot wounds, distinguishes this case from Littles v. DeFrancis, 517 F.Supp. 1137 (M.D.Ga.1981), where the court granted habeas relief on grounds similar to those Mr. Bishop now asserts. In Littles, no autopsy was performed to determine the origin of the pulmonary embolism which caused the victim's death. At 1156. The death certificate listed the cause of death as "pulmonary embolus, due to bronchopneumonia, due to congestive heart failure." Under "other significant conditions contributing to death but not related to the terminal disease condition" it stated: "gunshot wound to right parietal area and scapula, left hemiparisis [sic]." Littles v. State, 236 Ga. 651, 224 S.E.2d 918, 920-21 (1976). The medical expert who testified as to the cause of death could not say whether the gunshot wounds were a "major" cause of the victim's death, Littles, 517 F.Supp. at 1155; in fact, he did not know for certain whether the wound inflicted by the petitioner and the attendant disabilities were or were not a factor in her death. He merely testified that a pulmonary embolism was "consistent" with the victim's inactivity which resulted from her injuries. Id. at 1149. The evidence of causation in this case is stronger.
 
 III.
 
 19
 Georgia law provides that when an element of a crime is proven solely through circumstantial evidence,
 
 
 20
 the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of guilt of the accused.
 
 
 21
 Ga.Code Ann. Sec. 24-4-6; Nelms v. State, 150 Ga.App. 720, 258 S.E.2d 531 (1979). Mr. Bishop argues that this provision set the prosecution's burden of proof of proximate cause, that it is a higher standard than Jackson v. Virginia, and that because the prosecution failed to meet it, he is entitled to federal habeas relief.
 
 
 22
 We may assume, without deciding, that all the evidence tending to show proximate cause was circumstantial, so that Sec. 24-4-6 applied to his case in state court. While Sec. 24-4-6 is a state standard of proof not mandated by the federal constitution, see Jackson, 443 U.S. at 326, 99 S.Ct. at 2793, we have noted that under certain circumstances, "a state conviction which meets the Jackson standard but does not meet a higher state standard may create a due process issue...." Wilcox v. Ford, 813 F.2d 1140, 1145 (11th Cir.) cert. denied, 484 U.S. 925, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987) (citing Parker v. Procunier, 763 F.2d 665, 666 n. 1 (5th Cir.)), cert. denied, 474 U.S. 855, 106 S.Ct. 159, 88 L.Ed.2d 132. This does not mean, however, that whenever a state adopts a standard of proof arguably more stringent than that in Jackson, that higher standard automatically applies on federal collateral review.
 
 
 23
 As a federal habeas court, our review of the petitioner's conviction is limited to a consideration of whether the evidence is sufficient as a matter of federal constitutional law. In setting out the federal constitutional standard in Jackson v. Virginia, the Supreme Court expressly rejected the standard of proof now embodied in O.C.G.A. Sec. 24-4-6, and that state standard has no place in our sufficiency of the evidence analysis.
 
 
 24
 Wilcox, 813 F.2d at 1145 n. 7 (citations omitted). Only in a case where the failure to meet a higher state burden of proof raises independent constitutional concerns--for example, a violation of due process through the arbitrary or discriminatory failure to apply a state procedural rule[1]--would a federal court on collateral review examine the evidence to determine whether the state had met its self-imposed burden. Mr. Bishop presented his argument that the prosecution failed to meet the standard of proof under Sec. 24-4-6 to the Georgia Supreme Court, and it affirmed his conviction. There being no indication that its conclusion that the evidence was sufficient to satisfy the state standard of proof was arbitrary or discriminatory, there is no federal constitutional issue presented.
 
 
 25
 The district court's dismissal of Mr. Bishop's petition for the writ of habeas corpus is AFFIRMED.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 **
 Honorable Thomas E. Fairchild, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 See e.g., Tarpley v. Estelle, 703 F.2d 157, 162 n. 8 (5th Cir.), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983); Holloway v. McElroy, 632 F.2d 605, 640 n. 55 (5th Cir.1980)