**Charles A. LITTLES, Sr., Petitioner,**

v.

**Paul DeFRANCIS, Warden, Middle Georgia Correctional Institution, Men's Unit, Respondent.**

**Civ. A. No. 80-36-ATH.**

United States District Court, M. D. Georgia, Athens Division.

July 8, 1981.

Phillip S. McKinney, Atlanta, Ga., for petitioner.

Mary Beth Westmoreland, Atlanta, Ga., for respondent.

OWENS, Chief Judge:

Congress, composed of our publicly elected Senators and Representatives acting pursuant to the authority given them in the Constitution of the United States, has created our system of United States District Courts and by statutory provisions or laws

given these courts the responsibility and duty to hear and decide particular criminal and civil matters. Among those congressionally enacted statutory provisions or laws is the following found in 28 U.S.C. § 2254:

"(a) The Supreme Court, a Justice thereof, a circuit judge, *or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court* only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." (emphasis added).

■ The term "writ of habeas corpus" describes the legal procedure which gives to a person restrained of his liberty—imprisoned—an immediate court hearing so that the legality of his detention may be inquired into and determined by a court. As applied to the detention or imprisonment of persons by the states of these United States it is, in the words of the Supreme Court of the United States, "the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281, 286 (1969).

Legal encyclopedias remind us that:

"[t]he origin of the writ of habeas corpus is lost in antiquity. After the grant of Magna Charta, it gradually superseded other writs which had been used to enforce the right of personal liberty. In the reign of Henry VII its scope was broadened to apply in cases of restraint of a subject by the crown in addition to cases of restraint of a subject by another subject, to which its use had been previously limited. Abuses and evasions of the remedy led to legislation culminating in the

Habeas Corpus Act of 31 Car. II by virtue of which the writ of habeas corpus became 'the most celebrated writ in the English law.' ... It is generally considered that the American colonists brought with them to this country the remedy by habeas corpus as it existed in England as part of the common law. When the American colonies renounced their allegiance to the British crown, and became independent states, the right of the citizens to his remedy by habeas corpus in case of unlawful imprisonment was recognized and preserved by constitutional provisions and by various statutes modeled on the English Habeas Corpus Act of 31 Car. II. While the provision of the Constitution of the United States, that the privilege of habeas corpus shall not be suspended unless when, in cases of rebellion or invasion, the public safety might require it, does not purport to convey power or jurisdiction to the judiciary, but is merely in restraint of executive and legislative power ... it preserves the writ, and it has been stated that the writ is secured by the Fourteenth Amendment to the federal Constitution. So it has been held that the right to petition the courts of the United States is a constitutional right. ..." 39 C.J.S. Habeas Corpus §§ 2, 3, 4 pp. 460–464.

The already quoted congressionally enacted statute, 28 U.S.C. § 2254, represents Congress' judgment as to the procedure by which this constitutionally secured writ is made available to all detained persons in the courts of these United States.

Pursuant to said congressionally enacted statute or law petitioner Charles Littles filed his habeas corpus petition in this United States District Court[1] alleging that in

---

1. The procedural history leading up to this filing was as follows:

On January 30, 1975, petitioner Charles A. Littles, Sr., was convicted in the Superior Court of Greene County, Georgia, for the murder of Mary Virginia Reid and sentenced to life imprisonment. His motion for a new trial was denied, and he appealed his conviction to the Georgia Supreme Court. On April 6, 1976, that court affirmed the conviction and, on April 20,

1976, denied a timely motion for rehearing. *Littles v. State*, 236 Ga. 651, 224 S.E.2d 918 (1976). Petitioner filed a Petition for Writ of Habeas Corpus on April 26, 1979, in the Superior Court of Tatnall County, Georgia. That petition was heard on May 24, 1979, and an order was entered denying the petition and the relief requested therein on July 16, 1979. Petitioner then appealed that court's order to the Georgia Supreme Court. On February 20, 1980, the

the course of being tried, convicted, and sentenced by the Superior Court of Greene County, Georgia, to life imprisonment for murder he was deprived of his rights as guaranteed to him by the Constitution of the United States. In particular he says the evidence heard by the jury which found him guilty of murder does not measure up to the proof beyond a reasonable doubt that is required by the due process clause of the Fourteenth Amendment to the Constitution of the United States for him to be convicted of and sentenced for murder.

"The judicial Power of the United States [having been] vested in one supreme court ..." by Article III of the Constitution of the United States, it is the Supreme Court of the United States which construes and interprets the provisions of our Constitution. Its constructions and interpretations are the last, final word on the meaning of our Constitution; its final words are binding on all, including but not limited to, the courts of the fifty states of these United States and the United States District Courts and Courts of Appeals. Pursuant to this concept petitioner relies upon the Supreme Court's construction and interpretation of the due process clause of the Fourteenth Amendment as found in the case of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). There the Supreme Court of the United States stated:

"It is axiomatic that a conviction upon a charge not made or upon a charge not tried constitutes a denial of due process... These standards no more than reflect a broader premise that has never been doubted in our constitutional system: that a person cannot incur the loss of liberty for an offense without notice and a meaningful opportunity to defend... A meaningful opportunity to defend, if not the right to a trial itself, presumes as well that a total want of evidence to support a charge will conclude the case in favor of the accused. Accordingly, we held in the *Thompson* case that a conviction based upon a rec-

ord wholly devoid of any relevant evidence of a crucial element of the offense charged is constitutionally inform (sic)... The 'no evidence' doctrine of *Thompson v. Louisville* thus secures to an accused the most elemental of due process rights: freedom from a wholly arbitrary deprivation of liberty.

"The Court in *Thompson [v. Louisville]*, explicitly stated that the due process right at issue did not concern a question of evidentiary 'sufficiency.' 362 U.S., at 199, 80 S.Ct. 624 [at 625], 4 L.Ed.2d 654, 80 A.L.R.2d 1355. The right established in *In re Winship*, [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368] however, clearly stands on a different footing. *Winship* involved an adjudication of juvenile delinquency made by a judge under a state statute providing that the prosecution must prove the conduct charged as delinquent—which in *Winship* would have been a criminal offense if engaged in by an adult—by a preponderance of the evidence. Applying that standard, the judge was satisfied that the juvenile was 'guilty,' but he noted that the result might well have been different under a standard of proof beyond a reasonable doubt. In short, the record in *Winship* was not totally devoid of evidence of guilt.

"The constitutional problem addressed in *Winship* was thus distinct from the stark problem of arbitrariness presented in *Thompson v. Louisville*. In *Winship*, the Court held for the first time that the Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' 397 U.S. at 364, 90 S.Ct. 1068 [at 1072], 25 L.Ed.2d 368, 51 Ohio Ops 2d 323. In so holding, the Court emphasized that proof beyond a reasonable doubt has traditionally been regarded as the decisive differ-

lower court's denial of the petition was affirmed, with one Justice dissenting. *Littles v.*

*Balkcom*, 245 Ga. 285, 264 S.E.2d 219.

ence between criminal culpability and civil liability. Id., at 358–362, 90 S.Ct. 1068 [at 1071], 25 L.Ed.2d 368, 51 Ohio Ops 2d 323 . . . The standard of proof beyond a reasonable doubt, said the Court, 'plays a vital role in the American scheme of criminal procedure,' because it operates to give 'concrete substance' to the presumption of innocence, to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding. 397 U.S. 363, 90 S.Ct. 1068, 25 L.Ed.2d 368, 51 Ohio Ops 2d 323. At the same time, by impressing upon the factfinder the need to reach a subjective state of near certitude of the guilt of the accused, the standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. Id., at 372, 90 S.Ct. 1068 [at 1076], 25 L.Ed.2d 368, 51 Ohio Ops 2d 323 (Harlan, J., concurring).

"The constitutional standard recognized in the *Winship* case was expressly phrased as one that protects an accused against a conviction except on 'proof beyond a reasonable doubt. . . .' In subsequent cases discussing the reasonable-doubt standard, we have never departed from this definition of the rule or from the *Winship* understanding of the central purposes it serves . . . In short, *Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that *no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.*

"Although several of our cases have intimated that the factfinder's application of the reasonable-doubt standard to the evidence may present a federal question when a state conviction is challenged . . . the Federal Courts of Appeals have generally assumed that so long as the reasonable-doubt instruction has been given at trial, the no-evidence doctrine of *Thompson v. Louisville* remains the appropriate guide for a federal habeas corpus court to apply in assessing a state

prisoner's challenge to his conviction as founded upon insufficient evidence . . .

"The *Winship* doctrine requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. A 'reasonable doubt,' at a minimum, is one based upon 'reason.' Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as jury. In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction . . . Under *Winship,* which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that *when such a conviction occurs in a state trial, it cannot constitutionally stand.* A federal court has a duty to assess the historic facts when it is called upon to apply a constitutional standard to a conviction obtained in a state court . . .

"After *Winship* the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' *Woodby v. INS,* 385 U.S. at [276] 282, 87 S.Ct. 483 [at 486], 17 L.Ed.2d 362 (emphasis added). Instead, *the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" Citing 443 U.S. at 314–319, 99 S.Ct. at 2787–2789, 61 L.Ed.2d at 570–573. (emphasis added).

To those who argue that application of the beyond a reasonable doubt standard by

United States District Courts in federal habeas cases would unnecessarily interfere with the courts of the fifty states of these United States, the Supreme Court went on to say:

"In addition to the argument that a *Winship* standard invites replication of state criminal trials in the guise of § 2254 proceedings—an argument that simply fails to recognize that courts can and regularly do gauge the sufficiency of the evidence without intruding into any legitimate domain of the trier of fact—the respondents have urged that any departure from the *Thompson* test in federal habeas corpus proceedings will expand the number of meritless claims brought to the federal courts, will duplicate the work of the state appellate courts, will disserve the societal interest in the finality of state criminal proceedings, and will increase friction between the federal and state judiciaries. In sum, counsel for the State urges that this type of constitutional claim should be deemed to fall within the limit on federal habeas corpus jurisdiction identified in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067, with respect to Fourth Amendment claims. We disagree.

"First, the burden that is likely to follow from acceptance of the *Winship* standard has, we think, been exaggerated. Federal-court challenges to the evidentiary support for state convictions have since *Thompson* been dealt with under § 2254... A more stringent standard will expand the contours of this type of claim, but will not create an entirely new class of cases cognizable on federal habeas corpus. Furthermore, *most meritorious challenges to constitutional sufficiency of the evidence undoubtedly will be recognized in the state courts, and, if the state courts have fully considered the issue of sufficiency, the task of a federal habeas court should not be difficult...* And this type of claim can almost always be judged on the written record without need for an evidentiary hearing in the federal court.

"Second, the problems of finality and federal-state comity arise whenever a state prisoner invokes the jurisdiction of a federal court to redress an alleged constitutional violation. A challenge to a state conviction brought on the ground that the evidence cannot fairly be deemed sufficient to have established guilt beyond a reasonable doubt states a federal constitutional claim. Although state appellate review undoubtedly will serve in the vast majority of cases to vindicate the due process protection that follows from *Winship,* the same could also be said of the vast majority of other federal constitutional rights that may be implicated in a state criminal trial. *It is the occasional abuse that the federal writ of habeas corpus stands ready to correct...*

"The respondents have argued nonetheless that whenever a person convicted in a state court has been given a 'full and fair hearing' in the state system—meaning in this instance state appellate review of the sufficiency of the evidence—further federal inquiry—apart from the possibility of discretionary review by this Court—should be foreclosed. This argument would prove far too much. A judgment by a state appellate court rejecting a challenge to evidentiary sufficiency is of course entitled to deference by the federal courts, as is any judgment affirming a criminal conviction. *But Congress in § 2254 has selected the federal district courts as precisely the forums that are responsible for determining whether state convictions have been secured in accord with federal constitutional law.* The federal habeas corpus statute presumes the norm of a fair trial in the state court and adequate state postconviction remedies to redress possible error... *What it does not presume is that these state proceedings will always be without error in the constitutional sense.* The duty of a federal habeas corpus court to appraise a claim that constitutional error did occur—reflecting as it does the belief that the 'finality' of a deprivation of liberty through the invocation of the criminal sanction is simply not to be achieved at

the expense of a constitutional right—is not one that can be so lightly abjured." (emphasis added).

It is the exercise of this court's duty to appraise this petitioner's claim that constitutional error did occur in the courts of this state, to which this court now turns.

## CONSIDERATION ON APPEAL BY THE SUPREME COURT OF GEORGIA

### (a) Direct Appeal

After being convicted and sentenced by the Superior Court of Greene County petitioner appealed to the Supreme Court of Georgia and that court, in ruling upon his contention that the evidence was insufficient to support the jury's verdict of guilty of murder, stated:

"The appellant contends that the verdict was not authorized by the evidence. Argument is directed mainly to the question of whether the evidence was sufficient to show that the injuries received by Mrs. Reid on August 12, 1974, caused her death on December 25, 1974.

"Sheriff Wyatt testified that Mrs. Reid was in good physical condition, and able to work every day, prior to the time she was shot.

"Mrs. Reid's death certificate listed the cause of her death as pulmonary embolus, due to bronchopneumonia, due to congestive heart failure. Under 'other significant conditions contributing to death but not related to the terminal disease condition' the certificate stated: 'gunshot wound to right parietal area and scapula, left hemiparisis.'

"Dr. William H. Rhodes, who treated Mrs. Reid both before and after the shooting, testified that: He saw her at the Boswell hospital on August 12, 1974. She had gunshot wounds in her neck and head. He gave her emergency treatment and referred her to another hospital. He saw her later on several occasions as an out-patient. She was unable to use her left arm and hand, her left leg was weak, and she had some facial weakness. These were caused by the gunshot wound. She developed a psychosis, and because of her poor care and her mental disturbance, she was hospitalized for another period. He saw her again on December 15. She was hospitalized from this date through December 23. At this time she had bronchopneumonia and congestive heart failure. She was released on December 23, and returned to the hospital on the 24th. At that time she was comatose and the doctor on emergency duty was unable to revive her. It was the opinion of the witness that the cause of her death was pulmonary embolus. The gunshot wound left her weak physically, paralyzed on the left side. The psychosis she developed was consistent with her brain injury. *He did not know whether the gunshot wound caused her death.* The pulmonary embolus was consistent with the type of injury she received, because her partial paralysis and mental attitude made her inactive, and the inactivity could cause the embolus.

"*While the evidence was not overwhelming on the issue of whether Mrs. Reid's death was caused by the gunshot wounds,* there was sufficient evidence to authorize the jury to conclude that the wounds were the cause of the pulmonary embolus from which she died. The evidence, therefore, authorized the verdict.

"Judgment affirmed.

"All the Justices concur." 224 S.E.2d at 920. (emphasis added).

### (b) State Habeas Proceedings

The legislature of this state has formulated a procedure by which sentenced state prisoners who have unsuccessfully appealed their conviction and sentence may petition the Superior Court of the county in which the petitioner is confined for a writ of habeas corpus. That procedure, except in certain instances, permits constitutional claims to be raised by state habeas petition, to wit:

"Exclusive procedure for suing out a writ of habeas corpus for persons whose liberty is being restrained by virtue of a

sentence imposed against them by a State court of record

"Notwithstanding the other provisions of this Title, the following is the exclusive procedure for suing out a writ of habeas corpus for persons whose liberty is being restrained by virtue of a sentence imposed against them by a State court of record:

"(1) Grounds for writ.—

Any person imprisoned by virtue of a sentence imposed by a State court of record who asserts that in the proceedings which resulted in his conviction there was a *substantial denial of his rights under the Constitution of the United States* or of the State of Georgia or the laws of the State of Georgia *may institute a proceeding under this section.* Except for objections relating to the composition of a grand or traverse jury, rights conferred or secured by the Constitution of the United States shall not be deemed to have been waived unless it is shown that there was an intentional relinquishment or abandonment of a known right or privilege which relinquishment or abandonment was participated in by the party and was done voluntarily, knowingly, and intelligently. The right to object to the composition of the grand or traverse jury will be deemed waived under this section, unless the person challenging the sentence shows in the petition and satisfies the court that cause exists for his being allowed to pursue the objection after the conviction and sentence has otherwise become final.

\* \* \* \* \* \*

"(10) Subsequent petitions—waiver of grounds not claimed.—

*All grounds for relief* claimed by a petitioner for a writ of habeas corpus *shall be raised* by a petitioner in his original or amended petition. Any grounds not so raised are waived unless the Constitution of the United States or of the State of Georgia otherwise requires, or any judge to whom the petition is assigned, on considering a subsequent petition, finds grounds for relief asserted

therein which could not reasonably have been raised in the original or amended petition." Ga.Code Ann. § 50–127 (1979). (emphasis added).

The Supreme Court of the United States having decided *Jackson v. Virginia* in 1979 —between the time petitioner's direct appeal was adversely decided on April 6, 1976, and his state habeas case was argued in the Supreme Court of Georgia January 14, 1980, and decided February 20, 1980—the petitioner, after his application for a writ of habeas corpus was denied by the Superior Court of Tatnall County, appealed to the Supreme Court of Georgia, the highest appellate court of this State, and urged that court to apply the beyond a reasonable doubt standard as just pronounced by the Supreme Court of the United States to the facts of his case. The Supreme Court of Georgia recognized but refused to even consider petitioner's claim then presented as a *Jackson v. Virginia* constitutional claim saying:

"Defendant Charles A. Littles is serving a life sentence for the murder of Mary Virginia Reid.

"According to the evidence submitted at trial, the victim was shot in the head on August 12, 1974. She died four months later from pulmonary embolus, after identifying Littles as her assailant to two witnesses at the scene and testifying at his committal hearing on the charge of aggravated assault. Littles' conviction for murder was affirmed in *Littles v. State*, 236 Ga. 651, 224 S.E.2d 918 (1976). In April, 1979, he filed a petition for a writ of habeas corpus, which was denied. We granted his application to appeal the denial of his petition for habeas corpus.[1]

---

[1] On direct appeal, *Littles v. State*, supra, we considered, among other enumerations, the sufficiency of the evidence, whether the testimony of the two witnesses who spoke with the victim at the scene was admissible as part of the res gestae, and the admissibility of the testimony of the sheriff who heard the victim's testimony at the committal hearing. These same three subjects, *this time presented as constitutional questions*, are before us again on habeas corpus." (emphasis added).

"1. Littles contends that the trial court record contained no evidence as to the victim's cause of death upon which a rational jury could conclude beyond a reasonable doubt that the defendant was guilty of murder as required under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Georgia law requires claims as to the sufficiency of evidence to be raised on direct appeal; such a claim may not be raised in a state habeas corpus proceeding. *Head v. Hopper*, 241 Ga. 164, 165, 243 S.E.2d 877 (1978); *Allen v. Hopper*, 234 Ga. 642(2), 217 S.E.2d 156 (1975); *Coleman v. Caldwell*, 229 Ga. 656(2), 193 S.E.2d 846 (1972).

To this refusal to consider petitioner's constitutional claim, only one of the seven justices, Justice Hill, dissented. He said:

"I dissent only from Division 1 of the majority opinion.

"The majority rely on the rule that our law requires claims as to the sufficiency of the evidence to be raised on direct appeal, not on habeas corpus. They cite three cases for that proposition. Those three cases were decided when the 'any evidence' rule was in effect prior to *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In *Jackson*, the Supreme Court held that *a federal habeas corpus court must consider* not whether there was 'any evidence' to support a state court conviction but whether there was sufficient evidence to justify a rational trier of facts to find the essential elements of the crime beyond a reasonable doubt.

"Although the precise holding of *Jackson* fixed a constitutional standard of review in federal habeas corpus cases, the finding in that decision that due process requires that no person shall be made to suffer the onus of a criminal conviction except upon 'evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense,' resulted in this court adopting that standard of review on direct appeal. *Stinson v. State*, 244 Ga. 219(4), 259 S.E.2d 471 (1979); *Driggers v. State*, 244 Ga. 160, 161, 259 S.E.2d 133

(1979); *Boyd v. State*, 244 Ga. 130(5), 259 S.E.2d 71 (1979); *Jackson v. State*, 244 Ga. 276(1), 260 S.E.2d 15 (1979).

"*Jackson v. Virginia*, supra, elevated claims of insufficiency of the evidence to constitutional status.

"Our Habeas Corpus Act, Code Ann. § 50–127(1) (Ga.L.1967, pp. 835, 836, as amended) provides that 'Any person imprisoned by virtue of a sentence imposed by a State court of record who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of the State of Georgia or the laws of the State of Georgia may institute a proceeding under this section.'

"In the case before us Littles asserts that there was a substantial denial of his rights under the U.S. Constitution because he was convicted of murder on evidence which does not satisfy the *Jackson v. Virginia* standard. Relying on pre-*Jackson* cases, the majority do not explain why Littles can raise two confrontation claims on habeas corpus yet cannot assert a due process-sufficiency claim; i. e., cannot assert a denial of his due process rights under the Constitution of the United States as prescribed by our statute. Although it could precipitate a shower of habeas corpus cases, I would apply our habeas corpus statute and consider Littles' sufficiency claim on its merits.

"Examining the merits of this claim, it will be found that the victim was shot on August 12, 1974; that she was given emergency treatment at the Greene County hospital before being transferred to the Medical College of Georgia hospital in Augusta; that after she was sent home she was seen as an out-patient on several occasions; that at this time it was expected that she would live; that she was hospitalized in November for psychosis (nervous disorder, mental confusion, etc.); that she was hospitalized again from December 15 through 23rd for broncopneumonia and congestive heart failure; that

she was released on December 23rd and returned on the 24th of December at which time attempts to revive her failed. No autopsy was performed. She was 37.

"The victim's doctor testified that in his opinion based on examination of the body without an autopsy the cause of her death was pulmonary embolus, or blood clot travelling to the lung. When asked whether the August gunshot injury and its attendant disability caused or was a factor in her death, the doctor testified that he did not know. He testified that pulmonary embolus could be caused by surgery or just by inactivity. He stated that pulmonary embolus could have over a hundred causes and was consistent with the injury she received because she became inactive due to the gunshot wound which left her physically paralyzed on one side. He stated further that she developed psychosis from no known cause and that her general disposition led to a lot of inactivity and that she would not continue her physical therapy. He testified that her psychosis was consistent with her brain injuries. When asked on cross examination if he could say without doubt that the gunshot injuries caused the victim's death, the doctor said no.

"The death certificate prepared by the doctor whose testimony is summarized above showed that the cause of death was pulmonary embolus due to broncopneumonia due to congestive heart failure. The death certificate listed the gunshot wound under 'significant conditions contributing to death but not related to the terminal disease condition given ...' above.

"When this case was here on direct appeal, *Littles v. State,* supra, at a time when the any evidence standard was in effect, we found that (236 Ga. at 654, 224 S.E.2d at 921): 'While the evidence was not overwhelming on the issue of whether Mrs. Reid's death was caused by the gunshot wounds, there was sufficient evidence to authorize the jury to conclude that the wounds were the cause of the pulmonary embolus from which she died.'

"*Now, in my view, the proper standard of review has changed,* and *after viewing the evidence in the light most favorable to the prosecution, I cannot find that a rational trier of fact could have found beyond a reasonable doubt that the defendant's shooting of the victim in August caused her death in December. It could have caused her death, but that leaves room for reasonable doubt.* Using the higher standard of review I would grant habeas corpus relief.

"I would add only that the jury was not charged as to aggravated assault (this case was tried before *State v. Stonaker,* 236 Ga. 1, 222 S.E.2d 354 (1976), and thus the verdict of guilty of murder does not show that the jury found the defendant guilty of murder as opposed to being guilty of aggravated assault. In fact, when the jury wavered, they were instructed to find the defendant guilty of murder or not guilty. For the foregoing reasons, I respectfully dissent." (emphasis added).

By refusing to consider petitioner's constitutional claim the Supreme Court of Georgia, in the exercise of its supervisory powers over the trial courts of this State, lost its opportunity to evaluate petitioner's conviction in the light of the due process standard as promulgated by the Supreme Court of the United States and to express its opinion on whether or not petitioner's constitutional claim is meritorious. It left petitioner to resort to a United States District Court for consideration of his constitutional claim, and to a United States District Court the task of evaluating petitioner's constitutional claim without the benefit of the views of the Supreme Court of Georgia. It being the duty of this court to do so, this constitutes this court's evaluation of petitioner's constitutional claim.

PRIOR PROCEEDINGS IN THIS COURT

After his state habeas proceeding was unfavorably decided by the Supreme Court of Georgia petitioner's application for a writ of habeas corpus was filed in this court pursuant to 28 U.S.C. § 2241 *et seq.,* and

pursuant to this court's usual procedure was first referred to United States Magistrate Carey for him to submit proposed findings of fact and recommendations for disposition to a judge of this court in accordance with 28 U.S.C. § 636 and Rule 8 of Section 2254 Rules. As finally submitted Magistrate Carey's proposed finding and recommendation is that petitioner's conviction be set aside on the basis of the already quoted dissenting opinion of Justice Hill of the Supreme Court of Georgia. Those proposed findings and recommendations are now before a judge of this court for acceptance, rejection, or modification in whole or in part. 28 U.S.C. § 636(b)(1).

## THE DUE PROCESS CLAUSE APPLIED TO PETITIONER'S CASE

■ The evidence on which petitioner was convicted of murder is fairly summarized in Justice Hill's already quoted dissenting opinion. After viewing the evidence in the light most favorable to the prosecution, could any rational trier of fact have found the essential elements of the crime of murder beyond a reasonable doubt?[2] Jackson v. Virginia, 443 U.S. at 319, 99 S.Ct. at 2789.

For the shooting of a human being to constitute murder under the laws of the State of Georgia the prosecution must prove beyond a reasonable doubt that with malice aforethought there was an unlawful shooting which proximately caused the death of the victim. According to the Supreme Court of Georgia this necessary element of proximate causation may be proved beyond a reasonable doubt in either of the following ways:

"Where one inflicts an unlawful injury, such injury is to be accounted as the efficient, proximate cause of death, whenever it shall be made to appear, either that (1) The injury itself constituted the sole proximate cause of the death; or that (2) The injury directly and materially contributed to the happening of a

subsequent accruing immediate cause of the death; or that (3) The injury materially accelerated the death, although proximately occasioned by pre-existing cause. Redfield v. State, 240 Ga. 460, 461 [241 S.E.2d 217] (1978)." Wilson v. State, 190 Ga. 824, 829, 10 S.E.2d 861 (1940).

It is this necessary element of proximate causation which petitioner contends was not established by evidence beyond a reasonable doubt.

The prosecution's sole or only witness on the element of proximate causation was Dr. William H. Rhodes, Jr. His entire testimony was as shown by the following Xeroxed portions of the trial transcript:

THE COURT: together and will be sent to lunch. Just a minute, let's settle down back there. Please do not discuss this case among yourselves or permit anyone else to discuss it with you. You will be kept together for the present time and you may go to the Jury Room until preparations have been made for your lunch. Go to the Jury Room or you may be taken in charge of your bailiffs, two bailiffs take charge of the Jury.

(Court Reporter notes that Court is in Recess until 1:30 for the Noon Recess.)

THE COURT: Your may proceed, for the State, Mr. Briley.

MR. BRILEY: Call Dr. Rhodes.

### DR. WILLIAM H. RHODES

Witness being first duly sworn

Testified on

### DIRECT EXAMINATION

BY MR. BRILEY:

Q  Would you state your name for the record, please sir?

A  William H. Rhodes, Jr.

Q  You are a medical doctor?

A  I am.

Q  Where did you receive your education, Dr. Rhodes?

2.  Jackson v. Virginia has been applied retroactively to state habeas cases by this court and its application has been affirmed on appeal.

Holloway v. McElroy, 632 F.2d 605 (5th Cir. 1980), reh. den., 636 F.2d 314 (5th Cir. 1981).

A   The University of Georgia, Medical College of Georgia, and Grady Memorial Hospital in Atlanta.

Q   All right sir, how long have you been in practice?

A   13 years.

Q   And what type of practice are you in sir?

A   General Practice.

Q   And this involves some surgery?

A   Minor Surgery.

Q   Minor Surgery and the treatment of all types of injuries and disease?

A   Correct.

Q   Do you also do emergency treatment at the hospital here?

A   I do.

Q   All right sir, and you've been engaged in that since you've been here?

A   I have.

Q   All right sir, do you treat, do you treat traumatic wounds with some degree of frequency, do you not?

A   I do.

Q   All right sir, and Doctor, I'll ask you in the course of your duties as a physician, in this County, did you have an occasion on, on about August the 12th, to see Virginia Reid?

A   I did.

Q   And what was the nece—what warranted your services in this matter?

A   She was brought to the emergency room at the Boswell Hospital on the morning of August the 12th, with a history of having sustained a gunshot wound and I saw her in the emergency room.

Q   What type of injuries did you observe on her?

A   She had what appeared to be gunshot wounds to her right neck and her right frontal temporal area with obvious damage to her brain.

Q   With obvious damage to the brain?

A   Correct.

Q   All right sir, what method of treatment did you follow?

A   I gave her emergency treatment stabilizing blood pressure etc., X-rays to determine the extent of the lesions, then I referred her to the Neurosurgery Department at the Medical College of Georgia in Augusta.

Q   Did you follow up on this treatment or did you follow up on the type of treatments she received at the University Hospital?

A   I did, I had correspondence from the Medical College of Georgia and then I have seen her subsequently.

Q   And this correspondence in the treatment that she received as a part of your medical record on this patient?

A   It is.

Q   All right sir, and what treatment did she receive?

A   According to the correspondence from the Medical College of Georgia, she had surgical debridement of the wound, physical therapy, at Talmadge Hospital, then she was sent back home and she was followed down in there at the Neurosurgery Clinic periodically.

Q   Now, about the debridement of the wound, do you mean simply that it was cleaned?  Is that correct?

A   She had bone fragments and bullet fragments in the right side of her brain. The surgeons at Talmadge Hospital cleaned out all of the dead tissue and carotid tissue and closed the wound.  They did not do extensive resection of the brain.

Q   I show you State's Exhibit # 1, and I ask you if you recognize the person in that photograph and___

A   The profile, this does resemble Virginia Reid.

Q   The, do you see any location of any wounds or scar tissue that's visible in that photograph there?

A   Possibly on the right shoulder, but no sir.

Q   All right sir, after, after this initial treatment and the follow up, did, after she

returned from the hospital in Augusta, did you see her again?

A   Yes, I did.

Q   And what condition was she in, doctor?

A   I would like to refer to my record, if that's all right?  I saw her as an out patient on several occasions.  The patient was, was unable to use her left arm or hand, and her left leg was weak, she had what we call a hemiplegia, or a left sided weakness.  She also had some facial weakness, her eyes and her mouth.

Q   Do you know the cause of this hemiplegia on the left side?  Do you know the cause of that?

A   The cause of that was attributed to the gunshot wound.

Q   It's consistent with that type of wound in the right side here?

A   Hemisphere, that's correct.

Q   All right sir.

A   Would you like me to continue?

Q   Yes sir, continue please sir.

A   She also developed a sycosis and this is a nervous disorder, mental confusion, hallucinations, fear, unooperativeness, forgetfulness, etc. . .   I saw her in November of '74, and because of her poor care and her mental disturbance, she was hospitalized in Boswell Hospital on the 16th of November thru the 20th of November due to her sycosis.  From there she was transferred to the Regional Mental Hospital in Atlanta, Georgia for further evaluation.  I did not receive any correspondence from them, but I understand that she was being seen also by the Regional Mental Health Worker following her for her sycosis.  Then again, on December the 15th, of 1974, I saw the patient with labored respirations, she was hospitalized at Boswell Hospital December the 15th thru December the 23rd.  At this time she had bronciopneumonia and congestive heart failure.  She was treated at the Boswell Hospital for this condition.

Q   All right sir, was she later released from the hospital?

A   She was released from the hospital on the 23rd of December, she returned on the night of December the 24th, at approximately 11:15, at that time, she was comatose, she was unconscious and she did not have any blood pressure.   Dr. L.J. Wade was on, at the Emergency Room at that time and he examined the patient, tried to revive her, but the attempts failed and by the time I got to the hospital, the patient was dead.

Q   All right sir, did you, based on your treatment and experience with this deceased, Virginia Reid, and your, do you have an opinion as to the cause of death?

A   My medical opinion, the cause of death was a pulmonary embolus.

Q   Now, what is a pulmonary embolism, doctor?

A   A pulmonary embolus is a blood clot to the lung and this can travel to the lung from most any location in the body except the heart, but the blood clot can form in a person's leg, pelvis, etc. . ., break loose and travel to the lung and cause vascular collapse.

Q   All right sir, now what kind of person is, is, I don't say subject, I guess everyone is, but are any particular type of person more apt to suffer from this type of accident, this is what you call an accident, is it not?

A   We see this occurring in people who are inactive, certainly people who are debilitated, who have had long illnesses, often we see healthy people who have had recent surgery and have to be off their feet for a while, they will develope—

Q   In other words,—

A   Emboli.

Q   Any injury which injury or surgery which interrupts the natural flow of the blood or other, or disturbs the tissues, vital tissues in the body and all could give rise to such things as this, is that correct?

A   Just, just inactivity.

Q   Inactivity itself could do that?

A   Could do that, that's right.

Q   And based on your knowledge of her, and your observations of her, was she inactive?

A   Yes, she was inactive.

Q   Did you treat her prior to her injury?

A   Yes sir, I saw her the first time in April of 1969.

Q   What type of health was she in at that time?

A   Well, at that time, she gave me the history of being beaten by her husband, so she wasn't in too good of health then, but she was in fair physical health and in March of '71, I also saw her with a back injury and tension but as far as our examination is concerned, she was in good physical health.

Q   Based on your medical history of her, was she employed?

A   I do not have the history of her employment.

Q   All right, now, doctor, I ask you, based on your knowledge of these injuries she received in August of 1974, and her subsequent treatment, could you see, would it be your opinion whether or not this gunshot wound and it's attendant disability and disability was or was not a factor or did it cause her death?

A   I do not know.

Q   Is the type of accident from which she died, that is a pulmonary embolus, is it consistant with the type of injury and that she received?

A   Because of the inactivity?

Q   Yes.

A   It is consistant with it.

Q   It is consistant with that?

A   Yes.

Q   And do you know the cause of her inactivity?

A   Well, the gunshot wound left this patient weak physically, paralyzed on the left side.   The patient also developed a sycosis whether this was related to the gunshot wound or not, no one knows.   The patient's attitude general disposition, lead to her a lot of inactivity, the patient would not continue her physical therapy for example.

Q   The sycosis you refer to, and it's development, would you find that consistant with the traumatic injury which she had suffered in the injuries?   The physical injuries?

A   Her brain injuries have given rise to sycosis.

MR. BRILEY:   Thank you sir, he's with you.

*DR. WILLIAM H. RHODES, JR.—CROSS EXAMINATION BY MR. KOPP:*

Q   Your Honor, could I have just one second to look over a document that's going to be introduced later?

THE COURT:   Yes sir.

MR. KOPP:   Dr. Rhodes, let's get one little almost, it's not a informality, but of your own knowledge, based on your own personal knowledge, you don't know who inflicted these injuries on Mrs. Reid, do you?

A   No, I do not.

Q   Okay.   Now, Dr. Rhodes, when, when Mrs. Reid was shot and one of the bullets hit her in the head, as far as you could tell from your examination, what part of the head did the bullet hit?

A   The right side of her head, just above the angle, just above her cheek.

Q   Now, as far as you could tell from your examination, did the bullet penetrate any bone structure there?   Or any part of the skull or bone structure and go into the brain itself?

A   Yes, Mr. Kopp, I could see brain tissue through the wound.

Q   Now, what part of the brain would that bullet have gone into as far as you can tell?

A   The right frontal temporal area.

Q   Now, what effect would this, an inch of a bullet into this right frontal temporal area have on a person, his body first of all I mean?   Just what effect would, would his injury to that part of the brain cause upon a person?

A   Well, it, the possibilities are just enumerable, but from what we saw of this

patient, the effect would, on examination, in this case, paralysis of the left side and this is what she had and facial nerve paralysis.

Q What possible effect could it have on a person's memory as far as their ability to recollect, to think?

A It could have none whatsoever, or it could effect it tremendously.

Q You're not really, you don't really know right as far as this particular person went?

A When I saw the patient in the emergency room, after she was shot, she was conscious and she told me that she had been shot, and, I mean, so, I assumed she was rational when I examined her in my medical opinion, yes sir.

Q Now, you related today that at one time or rather you just related that she became sycotic, what did you mean by that term?

A Correct, the patient had fears, she expressed them that someone was after her, she was afraid that she was pregnant, she was afraid that she had a bad disease, by history from her, her family, the patient boarded up the doors, afraid that somebody was coming after her. When I talked with her on examination, she would see things at times she was hostile toward me, hostile toward the nurses, she was out of touch with reality on occasions. That's—

Q Now, that's, that's what I'd like to know. Could a person in this state of mind, can they conger up facts which are not in fact reality to a normal person?

A Do you mean that they can tell things that are not true?

Q No, I don't mean actually lie, I don't mean purposely lie, I mean can a person who is in a state of sycosis, can they view what a normal person would consider reality different? In other words, can they—

A Sir?

Q Can they in their own mind that something is there that is really not to a normal person?

A That is a sycosis, yes sir.

Q How much, well, what we, what is your opinion as far as the sycosis, was it strong in this case? Did she go through a lot of this?

A Yes, she did.

Q Well, this question would, would naturally follow, is it possible that Mrs. Reid in the state that she was in, in this state of sycosis, could believe that some person had shot her who in fact did not shoot her?

A Are you saying could this lady have neem sycotic before—

Q To that point.

A These, before she had a gunshot wound?

Q Well, yes sir, all right, answer that question first then.

A I had not examined this patient beforehand, so I could not answer that.

Q Well, didn't you say that she came in when she had been beaten by her husband?

A That was the history that she gave me.

Q Oh, she gave you that in history, okay.

A Yes sir.

Q I'm sorry. Well, okay, as far as, let's get back to this now, as far as her injury and extent of her injuries, could she have contrived in her mind the fact that somebody shot her and in fact did not shoot her? Now, we accepted the fact that she was shot, nobody is denying that. Is that possible?

A It is.

Q Is that a strong possibility in this case?

A I really don't have anyway of knowing because I had no way to evaluate this lady's mental condition prior to her injury.

Q Yes sir, but you do admit that that possibility exist and existed after she was shot?

A Yes sir.

Q Is it also a possibility that when the, when the bullet originally entered the brain, upon the original impact, that it had

a high probability of scrambling her ability to focus on reality after that time?

A   That is possible.

Q   Now, as far as this sycosis goes, in a loss of memory itself not a distortion of reality, a loss of memory, is there a possibility that a person who had suffered such an injury had a loss of memory?

A   A person sustaining such an injury going through the traumatic episodes, could possibly loss memory, yes sir.

Q   Now, Dr. Rhodes, immediately upon your original examination of her in the, in the hospital room, what was the condition of her lungs as far as you could tell?

A   They were functioning.

Q   All right, what was the condition of her heart?

A   I did not get a cardiogram but it was stable.

Q   Now, had, as far as you could tell had any of the bullets hit or affected the functioning of the heart or the lungs?

A   No, I could not tell that it had affected any.

Q   Now, what was her condition as far as her heart and her lungs go, when she returned from Augusta and came back under your care at a later time?

A   They were all right.

Q   They were just normal as far as you could tell?

A   Normal, right.

Q   How many times did you see her after she came back from Augusta?

A   Approximately eight to ten times, of course, I saw her everyday that she was in the hospital.

Q   Right.   At this time, other than at the very last episode when she had this attack or whatever you know, made her pass away, what was her condition of her heart and lungs during these eight or ten visits as far as you could tell?

A   According to my studies, while she was in the hospital, in November of '74, when she had the sycosis, her lungs and her cardiac functions were all right except she

did have a slight enlargement of the heart, which there again was acceptable, you know.

Q   Right, and this could have existed since she was born, then right?

A   That is correct or due to her obesity.

Q   Being shot wouldn't necessarily cause—

A   No, no sir, that's right.

Q   Such an effect?   Now, were any bullets remaining in her body which affected the functioning of her heart or her lungs?

A   No.

Q   There were bullets remaining in the body, is that correct?

A   There were bullet fragments remaining in her brain and there was a bullet fragment I think, on the right scapular area, under the skin, but this did not penetrate her chest cavity, so—

Q   Do you happen to know why these fragments weren't removed for any reason?

A   No, I could give you some suppositions, but I could not tell you exactly why.

Q   Now, as to her death itself, you testified that it was caused by an embolism, is that correct?

A   Pulmonary embolus, that's right.

Q   Okay, let's go right through this quickly again, what exactly is a pulmonary embolism again?

A   This is a blood clot that travels to the lungs or goes to the lung.

Q   Okay, now, what part of the lung does it effect?

A   It can effect any part of the lung.

Q   Any part?   Now, just of your general knowledge, how many known causes to a practicing physician and qualified physicians are there at this time for such embolisms?   How many, how many causes can you attribute such an embol—embolism to?

A   I don't exactly know what you, are you asking me to list the physical causes that can produce a pulmonary embolus?

Q   No sir, I'm just, I'm not asking you to list them all, I'm just asking you can you estimate how many different physical causes there can be in numbers that would cause such an embolism?  I mean are there ten?  Twenty?  Twenty-five?

A   Over a hundred.

Q   A hundred?

A   Or more.

Q   This can be caused—

A   Can cause an embolus?

Q   Right.

A   There again, I could right this afternoon.

Q   Right, but there are over—

A   Have it in writing.

Q   Well, is it right now just off your head you say there are a hundred causes that could cause such an embolism?

A   Yes.

Q   Now, as far as the blood clots go, I'm going to ask you the same question, how many causes do you know at this time that could cause such blood clots?  I mean, how many known medical causes are there for blood clots?

A   Well, you can list all operations, all illnesses, all mental conditions, anything that causes inactivity and you would have causes for producing blood clots.  You know, if you want to know antecedent—

Q   Right.

A   Events prior to the actual development of a blood clot.

Q   In other words, there is a possibility that such a blood clot existed in her body before she was ever shot?

A   That's correct, you could have one now.

Q   It could just be shaken loose by something in the sense of—

A   That is correct.

Q   Okay, she could have had it when she was born, is that not correct?

A   Not a blood clot, you would not think.

Q   You can develop it—

A   Anything is possible.

Q   Through age, right, okay.  Now, Dr. Rhodes, you are a General Practitioner, isn't that—

A   That's correct.

Q   That's correct, right?  And you're, are you a specialist in the heart field?

A   No.

Q   Are you a specialist in the area of blood clots?  Any area of the law that would involve that?

A   No.

Q   Specifically?

A   No.

Q   Now, you are basing your information solely upon visual examinations, is that right?  And other outer body examinaiton of this patient?

A   I'm basing what?

Q   Are you basing your opinion as to this matter solely on outer body examinations of this person?  Mrs. Reid?  In other words, you were not involved in any surgery to gain any opinion on this you're just what you saw when you looked at her, right?

A   That is physical examination and laboratory tests that I have run on this patient.

Q   Such as X-rays, right?

A   Correct.

Q   Okay, now if an autopsy had been performed here, would you have been better able to say what caused Mrs. Reid's death?

A   I would have been able to have been 100% sure that she died of a blood clot in her lung.  It is quite possible that I could not have found the origin of the clot.

Q   But then again, you will, could have, right?

A   It could have.

Q   Okay, do you know if there was any such autopsy here?

A   There was, there was not an autopsy run.

Q   Now, do you know why such an autopsy was not performed?

A No, it was not deemed necessary at the time.

Q Upon Mrs. Reid's return from the Augusta Hospital, what was your prognosis for her at this time when she came back from Augusta?

A Medical prognosis?

Q Yes sir.

A The patient was, was appeared that she was going to survive with physical disabilities.

Q But you did think she would live?

A That's correct.

Q Do you have any idea how long? Just in your estimation?

A Well, she could have lived out a normal life spand.

Q If these other things had not come in, right?

A That is correct.

Q And this was also taking into consideration that she took extremely good care of herself? Would you say that?

A Well, she would have continued medical therapy, physical therapy, examination, right.

Q Now, there's the statement on the death certificate here, which mentions pneumonia, is that not correct?

A That's right.

Q Now, when did she contract this pneumonia as far as you know?

A As far as I know, she had pneumonia December the 15th, 1974, that is the first time that I saw this patient with pneumonia.

Q I'm going to ask you another general question, how many causes are there for pneumonia that you know?

A Hundreds.

Q Hundreds?

A Yes.

Q She could have gotten it from anywhere, right?

A That's correct.

Q Can pneumonia kill a person without any intervening incident regardless? I mean, can it just, can pneumonia itself kill a person?

A A person can have pneumonia and die, yes sir.

Q That's what I'm asking. Thank you, all right. But she did have pneumonia at the time she passed away, is that correct?

A I did not examine the patient at the time of death, if you'll let me show you that death certificate, I wonder which one you're—

Q Okay.

A This has always been a, a thorn I think, in every physician's side. There are no places on a death certificate to say I don't know, and to give a history of a patient, but I had treated this lady for roughly two weeks prior to her death and I had listed these were the diagnoses that I had on a previous hospitalization, which was less than twenty-four hours prior to her demise, this is what she was treated for.

Q Would you mind reading those to the Court?

A The death certificate asked for the immediate cause of death, this I listed as pulmonary embolus. Due to, I listed bronchiopneumonia due to congestive heart failure. Now, there was no way on this death certificate or any death certificate that a doctor can give any explanation. You have to list and something has to go first and something has to go third, and you could sit down and discuss death certificates you know, on most illnesses. Also, in part two of the death certificate, it says other significant conditions contributing to the death, but not related to the terminal disease conditions. I think you could take that sentence and discuss that for a month, you know, so there I listed a gunshot wound to the right parietal area and a left hemiparasis.

Q So, what you're really saying there is all those things that are listed on this death, death certificate easily could not in actuality prove to be the actual cause that you've got it listed under that, right?

A   That is, what I am saying, is I have to put an immediate cause of death, and in my medical opinion it was due to a pulmonary embolus and then, the other thing you have to list something in a certain order, therefore it was done—

Q   Right.

A   You know, now, what was the question now?

Q   Fine, thank you.  Okay, you said that she didn't get enough exercise and gained excess weight, is that correct?  Now, you told me at one time I think, you might not have said it this way_ _ _ _

A   Fom the report that I got from her family was that Mrs. Reid did not get up, did not move about.  The reports that I got from the physical therapist was that she was not doing her exercises, that's right.

Q   Well, now, as far as you know, did you ever tell her to do the exercises?

A   Yes.

Q   What did she reply?

A   She wanted a physical therapist to do it.  But here again, as I've said, this woman's mind was not good at all times.

Q   Yes.

A   Now, at other times, she would say yes, you know, and she'd say, "I'm doing it doctor, I'm using my—"  You know.

Q   But from talking to the family you found that she wasn't really doing it, right?

A   Right, and then, her, her, her recovery was not progressing at the pace that you would expect if she had been doing her exercises.

Q   Would, and this was due to her non-cooperation?

A   That is correct.

Q   Which you stated earlier that she was non-cooperative at times?

A   That's correct.

Q   Did you put her in on any kind of diet when you heard this?  That she was gaining excess weight?

A   I, the thought occurred, but you know, diet, low salt, etc. . . ., trying to control the, this—

Q   Do you know if in fact this was done?

A   I would assume that it was not because she did not loose weight.

Q   Now, doctor, let me preface this by saying, I hope everybody in this County appreciates how many people you treat in this County, but how many people do you see a day, approximately?

A   How many patients do I see a day?

Q   How many patients do you see a day?

A   Oh, anywhere from 40 to 80, hundred.

Q   A day?

A   A day.

Q   And that means that in a week, you would see 5 or 600?

A   Well, I'd guess a week I'd see probably 3–400, yes.

Q   And in a month you'd see—

A   Just add it up.

Q   Thousands?  Or more?

A   Sometimes it seems like you've seen everybody.

Q   Now, I want you to understand this question, but in, in the great number of cases you've had, have you ever found yourself to be incorrect about a prognosis or diagnosis that you made at a later time?  I mean, even though it wasn't your fault when you made it, you know?

A   Sure!

Q   All right, and this could possibly exist here, right?

A   Certainly!

Q   Okay.

A   Yes sir.

Q   Well, let me ask you a tough question now, but can you solemnly swear without doubt that the injuries which Mrs. Reid received in these gunshot wounds, were the cause of her death?

A   No.

Q   Can you solemnly swear that they were the—

MR. BRILEY: Now, Your Honor, I object to that I think if he could start to say that,

the answer would be objectionable in this matter because he's asking the one case to give a medical opinion and asking him to solemnly swear in another that he knows the thing to be true. I—

THE COURT: Well, I think his preference is wrong, he's already solemnly swore, he can ask him, you don't have to keep on swearing this witness.

MR. KOPP: Well, I'm not, I'm not trying to—

THE COURT: Just ask the question.

MR. KOPP: Implicate. Okay. Dr. Rhodes, did, did you, well, let me back up and start again now. Can you say without a doubt that the injuries which Mrs. Reid received on August the 12th, from these gunshots were the cause of her death?

MR. RHODES: No.

Q  Can you say that they were the major cause of her death?

A  No!

Q  Now, you say, at one time she came in and related a history of having beaten, being beaten by her husband? Did she show you or relate to you any wounds that she received in those beatings?

A  Mr. Kopp, this was in April of 1969, I do not have a record of any extensive physical damage or any X-rays taken, so I would assume that it was not serious.

Q  All right, but something had happened in this beating could have caused a blood clot which caused the embolism, right? That's a possibility?

A  Remotely.

Q  Okay, you say she was related or sent to a Mental Hospital?

A  Yes, she was sent to the Regional Mental Hospital in Atlanta, Georgia.

Q  And did you ever hear from them in any way, as far—

A  I did not.

Q  As their findings?

A  No sir.

MR. KOPP: Okay, that's all.

*RE–DIRECT EXAMINATION BY MR. BRILEY:*

Q  Dr. Rhodes, in all of the time that you treated this, this deceased, do you know of any reason other than that gunshot wound, why she wouldn't be up and around, working and healthy right now?

A  The patient had a physical examination for work in September of 1972, and she passed the physical examination to work.

Q  All right sir, let me ask you now, this is important here it's a matter of dates, I believe I understood you to say that it was November before you experienced in your observations of her any notice of sycosis? Is that correct?

A  I, I did not, I said she was hospitalized at that time.

Q  When did you first note in your records that the occurrence of which you believe to be a sycosis?

A  I would see this patient at the hospital, I have recorded seeing her here in my office November the 14th, and at that time she was having some sycosis then.

Q  Let me ask you this to be more specific, on prior to, prior to October the 29th, do your records reflect that you noticed any evidence of sycosis in her?

A  I do not have this in my record as such, but through my memory, this patient was disturbed, uncooperative, etc..., on her return from Augusta.

Q  By that, you mean that she wouldn't take her exercises, and such things as that?

A  She was, quote, "Nervous and so forth."

Q  Yes, now, you had in previous times, when you had dealt with her prior to the injuries, did you notice any uncooperativeness or any stubbornness on her part in dealing with her?

A  In October of 1972, this patient complained of nervousness.

Q  Of nervousness? All right sir, now, you said that you had, that you could list a lot of antecedent reasons, I believe that is what you used, which could lead to the embolus, a formationing of the pulmonary

embolus, or a blood clot. Now, these or presence of these things are probably present in everybody, these antecedent reasons, is that correct? In some form or another?

A Of course, in some anybody, correct.

Q But usually it takes some event which triggers this mechanism, is that correct?

A That is correct.

Q And this shooting in the head and this attented illness and obesity following that by inactivity, could have been the mechanism, could trigger the mechanism, is that correct?

A Her inactivity could cause—

Q And you, and you did state that her—

A A blood clot.

Q Activity in your opinion, was due to her paraly—hemiparisis and in a statement?

A That is correct.

MR. BRILEY: All right, thank you sir.

*RE–CROSS EXAMINATION BY MR. KOPP:*

Q Dr. Rhodes, I don't want to be redundant here, but I want us to get one thing perfectly clear, as somebody we all know, used to say. Can you say without a doubt that the injuries which Mrs. Reid received on August the 12th, from the gunshot wounds were the cause of her death?

A No.

Q Can you say that they were the major cause of her death?

A No.

MR. KOPP: That's all.

*RE–DIRECT EXAMINATION BY MR. BRILEY:*

Q Do you know what caused it, do you know that they were not?

A No.

MR. BRILEY: All right, thank you sir.

THE COURT: May we excuse, Dr. Rhodes?

MR. KOPP: Yes sir.

MR. BRILEY: Yes sir.

THE COURT: Dr. Rhodes, you're excused, thank you.

DR. RHODES: Thank you.

THE COURT: Call your next witness.

MR. BRILEY: Call Sheriff Wyatt.

### SHERIFF L. L. WYATT

Witness being first duly sworn

Testified on
### DIRECT EXAMINATION

BY MR. BRILEY:

Q Would you state your name please sir?

A L. L. Wyatt.

Q Are you the Sheriff of Greene County?

A Yes sir, I am.

Q Were you Sheriff of Greene County on August the 12th, 1974?

A Yes sir, I was.

Q And for many years preceeding that, weren't you?

A Yes.

Q Sheriff, on that date, did you have an occasion to investigate an incident involving the shooting of Virginia Reid?

A I did.

Q And what were your, what brought this to your attention?

A In response to a telephone call that this lady had been shot.

Viewed in the light most favorable to the prosecution, Dr. Rhodes testified that the cause of death was a pulmonary embolus and that while a pulmonary embolus is consistent with the type of injury she received, he does not know whether or not this gunshot wound and its attendant disability and debility was or was not a factor or did cause her death. There are over a hundred causes of an embolus. An autopsy was not performed, so it is not possible to state the origin or cause of the blood clot. He cannot say without a doubt that the August 12th gunshot injuries were the cause of her death or the major cause of her death.

Paraphrasing Justice Hill's dissent, the standard of review by a habeas court changed between the time of direct appeal and consideration of petitioner's application for a writ of habeas corpus to the already discussed *Jackson v. Virginia* standard. After viewing the evidence in the transcript of petitioner's trial in the light most favorable to the prosecution, this court cannot find that a rational trier of fact could have found beyond a reasonable doubt that the petitioner's shooting of the victim in August caused her death in December. It could have caused her death, but could have leaves room for a reasonable doubt. As such, proof beyond a reasonable doubt as required by the due process clause of the Constitution of the United States is lacking. This United States Judge agrees with Justice Hill of the Supreme Court of Georgia and Magistrate Carey that this petitioner's conviction must be set aside.

Jurors of this court are regularly instructed as they are about to decide whether or not the guilt of a defendant has been proved beyond a reasonable doubt that:

"This is an important moment. Indeed, it is a dedicated moment in the contemplation of a civilized society. The fact that any person charged with a crime has an absolute and unquestioned right in this country to be confronted with his accusers through counsel of his own choosing, and to be judged by a fair and impartial jury of his peers after a fair trial, is of supreme and profound significance in the life of our nation and in the life of each one of us individually.

"The determination and administration of justice openly, calmly, patiently, slowly, deliberately, under the law, is one of the most sublime achievements of man. It is the capstone of our governmental structure and the touchstone of our democratic way of life.

"Wherever true justice is done all of us grow in strength and in spirit and whenever any violence is done to the administration of justice or injustice is dealt to any person, we are all, to that extent, weakened and impoverished, for injustice to any one person at any time gnaws at the vitals of the principle of justice for all.

"Your important function here today is to determine justice under the law in this particular case and thereby to nourish and sustain the validity of the ideal of justice under the law for all."

Like jurors who sit in judgment of their fellow citizens, it is also the important function of this court and its judges "to determine justice under the law in this particular case and thereby to nourish and sustain the validity of the ideal of justice under the law for all."

Justice under the law in this particular case demands that the writ of habeas corpus prayed for by petitioner Charles Littles be granted, that petitioner's conviction and sentence be set aside with prejudice,[3] and that petitioner be forever released from confinement. This order shall become effective at such time as respondent fails to appeal within the permitted time or at such time as this court's order is finally affirmed upon appeal. In the meantime, petitioner may apply to this court to be released on bail.

---

**3.** Since petitioner's conviction is being set aside on account of insufficiency of evidence, the Double Jeopardy Clause of the Constitution of the United States prohibits his being again tried on this or any lesser charge. *Burks v. United States*, 1978, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1.